# In the United States Court of Federal Claims

No. 20-143

Filed: December 9, 2020

|  |  |
|---|---|
| CHEYENNE & ARAPAHO TRIBES, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES, ) <br> ) <br> Defendant. ) <br> ) | Native American Treaty; Bad Men Clause; Individual Right; Tribal Right; Prudential Standing; *Parens Patriae* Doctrine; Motion to Dismiss; Subject Matter Jurisdiction; RCFC 12(b)(1); RCFC 12(b)(6). |

*J. Nixon Daniel, III*, Beggs & Lane, RLLP, Pensacola, FL, for plaintiff.

*Kristofor Ross Swanson*, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

This case involves a real and present problem affecting both Native American tribes and large parts of American society. Plaintiff seeks to use language from a clause found in many treaties between tribal governments and the United States that were executed during an era of Native American wars. These treaties, among other things, sought to reduce the friction between white and Native American communities that often led to violence and outright war. For the reasons noted below, the Court would have to totally ignore the history and language of these treaties, as well as long settled judicial precedent, in order to find that plaintiff has a legal basis for its claims. While the creative use of past legislation and treaties is an important component of an advocate's role, it is the duty of the judge to say what the law is, not what some may want it to be.

This matter is before the Court on defendant's Motion to Dismiss. Plaintiff, Cheyenne & Arapaho Tribes ("Plaintiff" or the "Tribe"), asserts a "bad men" claim against defendant "as a result of the wrongful acts of . . . the corporate pharmaceutical opioid manufactures, distributors, and their agents, . . . [as] 'bad men' among the whites . . . subject to the authority of the United States." Complaint at 30, ECF No. 1 [hereinafter Compl.]. Plaintiff seeks "compensation for damages sustained by the Tribe . . . to include money damages as compensation and reimbursement to the Plaintiff for the harm and loss it has sustained in the past and which it will sustain in the future." *Id*. In response, defendant filed a motion to dismiss, arguing the following: (1) the "bad men" clause created a cause of action for individuals, not tribal

governments, (2) plaintiff failed to exhaust the mandatory administrative remedies required to bring a "bad men" claim in this Court, and (3) even assuming that plaintiff could bring a "bad men" claim, plaintiff has not properly pled a "bad men" claim.  Defendant's Motion to Dismiss at 10, ECF No. 7 [hereinafter Def.'s Mot.].  For the reasons set forth below, defendant's Motion to Dismiss is granted.

## I.     Background

Plaintiff is a "federally recognized tribe of Southern Arapaho and Southern Cheyenne people in Western Oklahoma."  Compl. at 1.  Plaintiff is the beneficiary of several treaties entered into with the United States, including the Treaty of October 28, 1867 and the Treaty of May 10, 1868 (collectively referred to as the "Treaties").[1]  *Id.*; Treaty with the Cheyenne Indians, art. 1, Oct. 28, 1867, 15 Stat. 593 (1867) ("*Medicine Lodge Treaty*"); Treaty with the Cheyenne Indians, art. 1, May 10, 1868, 15 Stat. 635 (1868) ("*Fort Laramie Treaty*").  Article I of both Treaties contains a "bad men" clause, which states the following, in relevant part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

*Medicine Lodge Treaty*, art. 1; *Fort Laramie Treaty*, art. 1.  The general aim of the Treaties was "peace between the [tribes] and white settlers."  Def.'s MTD at 4 (citing *Jones v. United States*, 846 F.3d 1343, 1348 (Fed. Cir. 1987) (citations omitted)).

A brief description of the history of the opioid epidemic and the "Opioid Bad Men" provides the necessary context for this case.  The opioid epidemic has plagued the nation for decades and "is a current ongoing source of wrongful harm on the property and to the lives of the Tribal Members."  Compl. at 25.  "Within the Tribe, as everywhere in the United States, prescription opioids are more addictive than any other substance[] and [are] deadlier and more devastating than any other prescription or non-prescription drug."  *Id.* at 26.  The "Opioid Bad Men," allegedly include corporate pharmaceutical manufacturers, distributors, their agents, individuals serving on their governing boards, and those involved in the management, promotion, sale, and distribution of opioids across the nation.[2]  *See generally* Compl.  Generally,

---

[1]     Defendant indicates that plaintiff is not a beneficiary of the Treaty of May 10, 1868 ("*Fort Laramie Treaty*") because the Treaty was entered into with the *Northern* Cheyenne and Arapaho Tribes, which were distinct from plaintiff by that time.  Defendant's Motion to Dismiss at 3, ECF No. 7 [hereinafter "Def.'s Mot."] (emphasis added).  The Court declines to address this point as defendant admits that the relevant language in the Treaty of October 28, 1867 ("*Medicine Lodge Treaty*") and *Fort Laramie Treaty* are nearly identical, rendering a determination on this issue moot in a motion to dismiss.  *Id.* at 4.

[2]     According to the plaintiff, the "Opioid Bad Men" include the following companies: Purdue Pharma, LP; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; McKesson

plaintiff contends that the opioid epidemic, which has allegedly devastated the Tribe and its members, was caused by the [Opioid Bad Men], "who all engaged in a lengthy civil conspiracy, via fraud, misrepresentation, and intentional wrongful conduct, to cause as many people as possible, including those within the economic proximity of the Tribe, to use and get addicted to opioid prescription pills," with select Opioid Bad Men even pleading guilty to criminal charges.[3] *Id.* at 2, 11, 29. Specifically, plaintiff claims that the Opioid Bad Men, "in reckless disregard for the consequences, increased prescription drug marketing and sales, and flooded the Tribe and tribal communities with prescription opioids." *Id.* at 27. Accordingly, plaintiff contends that the Opioid Bad Men are "clearly 'bad men' under the Treaties, which entitles the Tribe to reimbursement for losses sustained as a result of the 'bad men's' actions," *id.* at 2, including the costs of providing the following services to the Tribe's members:

> (1) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths, (2) counseling and rehabilitation services, (3) treatment of infants born with opioid-related medical conditions, (4) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation, and (5) law enforcement and public safety relating to the opioid epidemic within the Tribe.

*Id.* at 29.

In 2018, plaintiff filed three separate complaints in state courts within the State of Oklahoma, alleging numerous claims sounding in tort against opioid manufacturers and distributors.[4] Def.'s MTD, Ex. 1–3. In 2019, the three cases were removed to federal court and eventually transferred by the Judicial Panel on Multidistrict Litigation ("MDL") to the Northern District of Ohio. Def.'s MTD at 6–7. On November 5, 2019, while plaintiff's MDL cases were still pending, plaintiff sent a letter to the Department of Interior's Assistant Secretary for Indian Affairs ("Assistant Secretary") to "present their ['bad men'] claim pursuant to Article I of the Medicine Lodge Treaty." Def.'s MTD, Ex. 8 at 1. On February 10, 2020, plaintiff filed its Complaint with this Court, asserting a "bad men" claim and alleging damages to the Tribe and its members "in its proprietary capacity and under its *parens patriae* authority." Compl. at 3, 29.

---

Corporation; Cardinal Health, Inc.; Amerisourcebergen Corporation; Amerisourcebergen Drug Corporation; CVS Health; Walgreens Boots Alliance, Inc.; Walmart, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Actavis PLC; Allergan Finance, LLC; Teva Pharmaceuticals Industries, Ltd; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Mallinckrodt, PLC, d/b/a Mallinckrodt, LLC, and the officers, directors and agents of these entities. Complaint at 3, n.1, ECF No. 1 [hereinafter Compl.].

[3]  Plaintiff states that Purdue Pharma, L.P., Purdue Pharma, Inc., and The Purdue Frederick Company (collectively referred to as "Purdue") settled criminal and civil charges against it for misbranding opioids and agreed to pay the United States $365 million dollars. Compl. at 7.

[4]  Each case includes claims for nuisance, negligence, unjust enrichment, fraud, civil conspiracy, and violation of state law. Def.'s MTD, Ex. 1–3.

On March 16, 2020, the Assistant Secretary responded to plaintiff's November 2019 letter, identifying numerous deficiencies therein and requesting more information. *See generally* Def.'s MTD, Ex. 9. In the Tribe's April 22, 2020 response to the Assistant Secretary's March 2020 letter, plaintiff failed to provide any further factual evidence in support of its claim. *See generally* Def.'s MTD, Ex. 10. On May 21, 2020, the Assistant Secretary again contacted the plaintiff, reiterating her request for more information, which the plaintiff seemingly never provided. *See generally* Def.'s MTD, Ex. 11. On May 26, 2020, defendant filed its Motion to Dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), arguing that the Tribe does not have standing to bring a "bad men" claim and, even if it did, that the Tribe has not properly pled a "bad men" claim. *See generally* Def.'s MTD. On July 16, 2020, plaintiff filed its Response to defendant's Motion to Dismiss, asserting that the Tribe does have standing to bring a "bad men" claim and that it has properly stated such a claim. *See generally* Memorandum in Opposition to Motion to Dismiss of United States of America, ECF No. 10 [hereinafter Pl.'s Resp.]. On July 30, 2020, defendant filed its Reply, reiterating its arguments in support of its Motion to Dismiss. *See generally* United States' Reply in Support of Its Motion to Dismiss, ECF No. 11 [hereinafter Def.'s Reply]. The Court held oral argument on October 2, 2020. Defendant's Motion to Dismiss is fully briefed and ripe for review.

## II.     Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives this Court the power "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2018). Though the Tucker Act expressly waives the sovereign immunity of the United States against such claims, it is "merely a jurisdictional statute and does not create a substantive cause of action" enforceable against the United States for money damages. *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)); *Quimba Software, Inc. v. United States*, 132 Fed. Cl. 676, 680 (2017) (citing the same). Instead, "a plaintiff must identify a separate source of substantive law that creates the right to money damages," such as a money-mandating constitutional provision. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983)); *Loveladies Harbor. Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Jurisdiction is a threshold issue that "must be resolved before the Court can take action on the merits." *Remote Diagnostic Techs. LLC v. United States*, 133 Fed. Cl. 198, 202 (2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). When a "motion to dismiss 'challenges the truth of the jurisdictional facts,'" this Court "'may consider relevant evidence in order to resolve the factual dispute'" and may make factual findings that are decisive of the jurisdictional issue. *Freeman v. United States*, 875 F.3d 623, 627 (Fed. Cir. 2017) (quoting *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)); *Hedman v. United States*, 15 Cl. Ct. 304, 306 (1988). When considering a motion to dismiss for lack of subject-matter jurisdiction, the Court will treat factual allegations in the complaint as true and will construe those allegations in the light most favorable to the plaintiff. *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014); *Oakland Steel Corp. v. United States*, 33 Fed.

Cl. 611, 613 (1995) (citing *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)). However, the plaintiff must still establish that this Court has jurisdiction over its claims by a preponderance of the evidence. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

This Court will dismiss a case pursuant to RCFC 12(b)(6), "when the facts asserted by the claimant do not entitle him to a legal remedy." *Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575, 581 (2019). "In reviewing a motion to dismiss for failure to state a claim, the Court "must accept as true all the factual allegations in the complaint . . . and [] must indulge all reasonable inferences in favor of the non-movant." *Id*. (quoting *Sommers Oil Co. v. United States*, 241 F. 3d 1375, 1378 (Fed. Cir. 2001)). The Court will grant a motion to dismiss when faced with conclusory allegations that lack supporting facts, as "a formulaic recitation of the elements of a cause of action" alone will not withstand a motion to dismiss. *Id*.

### III. Discussion

In its Complaint, plaintiff asserts a "bad men" claim and requests that the Court award compensation, pursuant to the Treaties, "for the damages which it has incurred in the past and for those damages which it will incur in the future all as a result of the wrongful acts of the Opioid Bad Men." Compl. at 30. In its Motion to Dismiss, defendant contends that the Complaint should be dismissed pursuant to RCFC 12(b)(1) and RCFC 12(b)(6) for the following reasons: (1) the "bad men" clause created a cause of action for individuals, not tribal governments, (2) plaintiff has failed to exhaust the mandatory administrative remedies required to bring a "bad men" claim in this Court, and (3) even assuming that plaintiff could bring a "bad men" claim, plaintiff has not properly pled the elements necessary to do so. Def.'s MTD at 10.

#### A. Rule 12(b)(1)

Defendant first contends that the Court does not have jurisdiction over plaintiff's "bad men" claim because the "bad men" clause created a cause of action for individuals, not tribal governments, and because plaintiff has not yet exhausted its administrative remedies. Def.'s MTD at 10. The Court agrees with defendant's first argument, and as a result, finds that it lacks jurisdiction over plaintiff's "bad men" claim. Accordingly, the Court need not address the argument related to the exhaustion of mandatory administrative remedies.

##### 1. Individuals vs. Tribal Governments

In support of its allegation that the "bad men" clause created a cause of action for individuals, not tribal governments, defendant cites to *Hebah v. United States*, a case in which the Federal Circuit's predecessor held that the "bad men" clause created an individual right. Def.'s MTD at 11; *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970) ("*Hebah I*"). In response, plaintiff argues that the Court should apply the liberal canons of construction in interpreting Native American treaties, and that the court in *Hebah I* did not explicitly exclude Tribes from bringing "bad men" claims. Pl.'s Resp. at 7–8. After a comprehensive analysis of relevant case law, the Court agrees with defendant's argument and finds that the "bad men" clause created a cause of action for individuals, not tribal governments.

The Court has long held that "the interpretation of a treaty, like the interpretation of a statute, begins with its text." *Richard v. United States*, 677 F.3d 1141, 1145 (Fed. Cir. 2012) (quoting *Medellin v. Texas*, 552 U.S. 491, 506 (2008)). In interpreting Native American treaties, the Court must "honor any unambiguous language in the treaty." *Jones v. United States*, 846 F.3d 1343, 1352 (Fed. Cir. 2017) (citing *Northwestern Bands of Shoshone Indians*, 324 U.S. 335, 353 (1945) ("We stop short of varying [the Treaty's] terms to meet alleged injustices.") (citations omitted)). The text of the "bad men" clause states, in relevant part, that "the 'wrong' in question must be to '*person or property*,' and the United States . . . is to 'reimburse the injured *person* for the loss sustained.'" *Medicine Lodge Treaty*, art. 1; *Fort Laramie Treaty*, art. 1 (emphasis added). Although plaintiff argues that the liberal canons of construction should be applied in interpreting the Treaties, the Court finds that there is no ambiguity in the Treaties' text, and, as such, the Court need not apply the above. *See Chickasaw Nation v. United States*, 534 U.S. 84, 88–89 (2001) (rejecting the application of the liberal-construction canon where the Court found no ambiguity). The plain language of the "bad men" clause clearly states that "the United States . . . is to reimburse the injured *person* for the loss sustained." *Medicine Lodge Treaty*, art. 1; *Fort Laramie Treaty*, art. 1 (emphasis added). Had the treaty-parties intended to create a tribal interest, the Treaties' text would reflect such intention. *Hebah I*, 428 F.2d at 1338 (holding that the "injured Indian is an 'intended beneficiary' of Article I because recognition of his rights is appropriate to effectuate the intention of the treaty-parties.").

Furthermore, in *Hebah I*, the Federal Circuit's predecessor was faced with interpreting an identical "bad men" clause in another tribe's treaty. *Hebah I*, 428 F.2d at 1337. After a comprehensive review of the treaty's text and relevant case precedent, the court in *Hebah I* held, based on the theory of third-party contractual beneficiaries, that the "bad men" clause created a cause of action for individuals, not tribal governments. *Id.* at 1338. Specifically, that court determined that "the obligation and payment both run directly to the individual, . . . the tribe is ***not*** to be the channel or conduit through which reimbursement is to flow. . . . The obligation and the right are each individual and personal." *Id.* (emphasis added). Therefore, the Court rejects plaintiff's argument that *Hebah I* did not explicitly preclude Tribes from bringing "bad men" claims. Moreover, this Court has uncovered no case in which a tribe has successfully brought an *independent* claim for damages under a "bad men" clause.[5] Accordingly, the Court agrees with defendant's interpretation of *Hebah I* and finds that the "bad men" clause created a cause of action for individuals, not tribal governments, and, thus, the Tribe improperly brought such a claim in the case at bar.

---

[5] Plaintiff only cites to *Tsosie v. United States* in arguing that *Hebah I* did not preclude "bad men" claims brought by Tribes. Memorandum in Opposition to Motion to Dismiss of United States of America at 8, ECF No. 10 [hereinafter Pl.'s Resp.]; *Tsosie v. United States*, 825 F.2d 393, 398–99 (1987). The Court finds plaintiff's citation unpersuasive for the following reasons: (1) in *Tsosie* the "bad men" claim was brought by an individual tribal member, not the tribe, and (2) the Federal Circuit in *Tsosie* was not faced with the same issues as those presented in *Hebah I*.

### 2.      **Prudential Standing and the Doctrine of *Parens Patriae***

Additionally, defendant argues that plaintiff lacks prudential standing to pursue a "bad men" claim on behalf of the Tribe and its members and that the Tribe cannot invoke the doctrine of *parens patriae* to litigate such a claim on behalf of its members. Def.'s MTD at 12, 14. Plaintiff fails to address defendant's first argument in its Response, but it does allege that it has "standing to bring a *parens patriae* claim on behalf of its members." Pl.'s Resp. at 10. The Court agrees with both of defendant's arguments and finds that the Court lacks the requisite jurisdiction over plaintiff's "bad men" claim.

The Court will first address defendant's argument that plaintiff lacks prudential standing to bring a "bad men" claim on behalf of the Tribe and its members. *See* Def.'s MTD at 12. In *Starr Int'l Co. v. United States*, the Federal Circuit referred to the principle of third-party standing "as a 'prudential' principle: that a party 'generally must assert his own legal rights and interests, and cannot rest his claim [for] relief on the legal rights or interests of third parties.'" *Starr Int'l Co. v. United States*, 856 F.3d 953, 965 (Fed. Cir. 2017) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)). "This principle of third-party standing 'limit[s] access to the federal courts to those litigants best suited to assert a particular claim.'" *Id.* (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979)). Moreover, the third-party standing principle "also recognizes that . . . the third-party right-holder may not in fact wish to assert the claim in question." *Id.* (*citing Singleton v. Wulff*, 428 U.S. 106, 116 (1976)). As iterated above, the "bad men" clause created an individual right, ***not*** a tribal one. *See Hebah I*, 428 F.2d at 1337. After a thorough analysis of the relevant case law, it is clear that defendant was correct in its assertion that "by the very nature of its claim, the Tribe would be litigating the rights of individual tribe members" in violation of third-party standing and prudential standing principles. Def.'s MTD at 13. Consequently, the Court lacks jurisdiction over plaintiff's claims.

Second, the Court analyzes defendant's argument that the Tribe cannot utilize the *parens patriae* doctrine to litigate the "bad men" rights of its individual members. Under the *parens patriae* doctrine, states have standing to litigate quasi-sovereign interests "in the well-being of the populace." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982). However, the following two requirements must be met for states to have standing under the doctrine of *parens patriae*: (1) states must have a quasi-sovereign interest in the dispute, apart from the interests of particular private parties; and (2) there must be an injury to a substantial segment of its population. *Id.* at 607. Defendant contends that plaintiff cannot bring a *parens patriae* claim because the *parens patriae* doctrine does not apply to claims against the United States, plaintiff has not asserted a quasi-sovereign interest, and not all tribal members have suffered the alleged wrongs committed by the "Opioid Bad Men." Def.'s MTD at 14–15. In response, plaintiff argues that the Tribe can bring a *parens patriae* claim, that the Tribe has asserted a quasi-sovereign interest, and that the claim at issue affects a substantial segment of the Tribe. Pl.'s Resp. at 10–11.

The Court agrees with defendant's argument that plaintiff has not asserted a quasi-sovereign interest. Generally, defendant argues that the alleged wrongs are not against quasi-sovereign interests, but, rather, against "interests specific to each individual tribal member

who has been the victim of the alleged 'wrong upon' his or her 'person or property.'" Def.'s Reply at 6 (citing *Medicine Lodge Treaty*, art. 1). In response, plaintiff contends that it has asserted wrongs against quasi-sovereign interests because "the claim at issue affects the entire Tribe and has an even greater effect on a substantial segment of the Tribe." Pl.'s Resp. at 11. Moreover, Plaintiff cites to *Sisseton-Wahepton Sioix Tribe of Lake Traverse Indian Reservations, North Dakota and South Dakota v. United States* in support of its *parens patriae* standing argument. Pl.'s Resp. at 12; *Sisseton-Wahepton Sioix Tribe of Lake Traverse Indian Reservations, North Dakota and South Dakota v. United States*, 90 F.3d 351 (9th Cir. 1996). As an initial matter, the Court finds plaintiff's citation unpersuasive, as the Court in *Sisseton-Wahepton Sioix Tribe* did not analyze the *parens patriae* doctrine and because that tribe was not asserting the interests of particular private parties. *See Sisseton-Wahepton Sioix Tribe*, 90 F.3d 351.

In *Alfred L. Snapp & Son*, the Supreme Court specified that, to assert a quasi-sovereign interest, "the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party." *Alfred L. Snapp & Son*, 458 U.S. at 607; *see also Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1083 (9th Cir. 2019) (noting, in rejecting a *parens patriae* claim, that "quasi-sovereign interests are not individual rights."). As this Court has repeatedly iterated, the "bad men" clause created an individual right, ***not*** a tribal right. *See Hebah I*, 428 F.2d at 1337. Implicit in that finding is that the "bad men" clause applies to the interests of a particular "wronged" tribal member, not to the Tribe as a whole. Therefore, the Court finds it irreconcilable to allow the Tribe to proceed via the *parens patriae* doctrine, as the articulated harms are solely to the private interests of tribe members and, therefore, are emphatically not against quasi-sovereign interests. Accordingly, and after a comprehensive review of the parties' arguments, the Court finds that plaintiff has failed to assert a quasi-sovereign interest and, as a result, plaintiff cannot utilize the *parens patriae* doctrine to litigate the "bad men" rights of its individual members. Consequently, the Court need not address the remaining arguments related to the *parens patriae* doctrine.

For the reasons set forth above, the Court is unpersuaded by plaintiff's arguments related to the "bad men" clause, prudential standing, and the *parens patriae* doctrine. The "bad men" clause protects the rights of individuals, not the Tribe as a whole, and the Tribe cannot use the *parens patriae* doctrine to overcome its jurisdictional defects. As such, plaintiff's Complaint should be dismissed pursuant to RCFC 12(b)(1).

### B.     Rule 12(b)(6)

In addition to its RCFC 12(b)(1) arguments, defendant contends that plaintiff has not pled a cognizable "bad men" claim, because the Complaint does not allege that a specific non-Indian came onto the Tribe's reservation and criminally harmed a specific member of the tribe. Def.'s MTD at 19. In *Jones*, the Federal Circuit was faced with interpreting a nearly identical "bad men" clause to the clause presently at issue. *See Jones*, 846 F.3d 1343. In that case, the Federal Circuit articulated the elements of a "bad men" claim and held that, in order to successfully allege a claim for relief under such a provision, a plaintiff must provide "the identification of particular 'bad men,' and an allegation that those men committed a wrong within the meaning of the treaty." *Id*. at 1352 (citing *Hernandez v. United States*, 93 Fed. Cl. 193, 200 (2010); *Ex parte*

*Kan-gi-shun-ca*, 109 U.S. 556, 567–68 (1883)). Specifically, the court held that the interpretation of cognizable claims under "bad men" provisions "requires consideration of three issues: (1) the nature of the cognizable wrongs, (2) the universe of applicable 'laws of the United States,' and (3) the geographic location of the wrongs." *Id.* at 1353.

First, defendant contends that plaintiff has failed to state a "bad men" claim because the Complaint is "primarily based upon corporate actions, rather than those of individuals."[6] Def.'s MTD at 19. As mentioned above, successfully alleging a claim for relief under the "bad men" provision requires the "identification of particular 'bad men.'" *Jones*, 846 F.3d at 1352. Consequently, defendant argues that "claims against corporations or entities are not cognizable" because they are not against a specific person or persons. Def.'s MTD at 17 (citing *Hernandez*, 93 Fed. Cl. at 200 (citations omitted)). In its Response, plaintiff entirely fails to address this argument. However, during oral argument, plaintiff argued that claims against entities are cognizable because the dictionary definition of the word "person" includes entities and because entities cannot act without the direction of a person. The Court is not persuaded by that argument and declines to address arguments that were raised for the first time at oral argument but entirely excluded from the Complaint and Response. *See generally* Compl.; Pl.'s Resp. Moreover, upon a comprehensive review of case precedent, it is evident that claims against entities are not cognizable under the Treaties and finding otherwise would exceed the intended scope of the "bad men" clause. *See Hernandez*, 93 Fed. Cl. at 200 (holding that "a court … is not a specific white man, and may not qualify as a 'bad man' for the purposes of this treaty without extending the Fort Laramie Treaty beyond its intended bounds."); *Garreaux v. United States*, 77 Fed. Cl. 726, 737 (2007) (holding that a federal agency is incapable of qualifying as a "bad man" under the bad men provision). Consequently, the Court determines that claims against entities are not cognizable under the Treaties, as an entity is not a "particular bad man." *See Jones*, 846 F.3d at 1352.

Second, defendant alleges that plaintiff has not properly stated a "bad men" claim because plaintiff "failed to allege a 'wrong' that would be cognizable under the Treaty." Def.'s MTD at 16. In *Jones*, the Federal Circuit acknowledged that it had not previously "defined the types of alleged wrongs cognizable under the bad men provisions of this and similar treaties." 846 F.3d at 1353. After a comprehensive review of the text, history, purpose, and negotiations related to the treaty at issue in that case, as well as prior case precedent, the court in *Jones* determined that "only acts that could be prosecutable as criminal wrongdoing are cognizable under the bad men provision." *Id.* at 1355; *See Ex parte Kan-gi-shun-ca*, 109 U.S. at 567–68 (explaining that the primary intent of the "bad men" provision "was to guard against affirmative criminal acts, primarily murder, assault, and theft of property"). Additionally, the *Jones* court specified that both "wrongs" that occur on a tribe's reservation and off-reservation wrongs resulting directly therefrom could give rise to a "bad men" claim. *Id.* at 1361.

---

[6] Defendant admits that "the Tribe does identify some company owners or executives," however, "the Complaint does not allege any of those individuals to have ever set foot on the Tribe's lands." Def.'s MTD at 19–20 (citing Compl. ¶¶ 28–37). The Court discusses the implications of failing to allege on-reservation conduct in a separate section of this decision.

- 9 -

Defendant contends that "the Complaint fails to identify any specific on-reservation crime for which the United States would be authorized to make an arrest." Def.'s MTD at 20. Additionally, defendant argues that the alleged wrongs are off-reservation torts and that "the Tribe alleges a broad, nationwide civil tort conspiracy, the effects of which are felt by members of the Tribe, some of whom reside on the Tribe's lands." *Id*. at 19 (citing to Compl. ¶¶ 4, 7, 86–89, 91–98). In response, plaintiff argues that the alleged actions are on-reservation activities that "make clear that the wrongs of the [Opioid] Bad Men have been perpetrated both on Indian Tribal lands and in a manner specially designed to impact and damage tribal members."[7] Pl.'s Resp. at 14. Finally, plaintiff cites to Purdue's 2007 criminal and civil settlement as an admission of criminal conduct. *Id*. at 17. In its Reply, defendant argues that references to prior criminal proceedings do not cure plaintiff's pleading deficiencies as Purdue is an entity, not an individual. Def.'s Reply at 9.

After careful review of the parties' arguments, it seems clear to the Court that plaintiff fails to allege a "wrong" cognizable under the Treaty. Defendant is correct in arguing that the Complaint fails to identify any specific on-reservation activity as prescribed by the court in *Jones*. *See generally* Def.'s MTD. On its face, plaintiff's Complaint purports to hold the federal government liable for the nation-wide opioid epidemic based on allegations that the Opioid Bad Men manufactured, promoted, distributed, and sold opioids nationally and onto tribal lands. *See generally* Compl. Although the Court sympathizes with the hardships associated with the opioid epidemic, the Court finds that plaintiff failed to allege a cognizable "wrong." As articulated in *Jones*, "wrongs" that occur on a tribe's reservation, or off-reservation wrongs resulting directly therefrom, can give rise to a "bad men" claim. *Jones*, 846 F.3d at 1361. Defendant attempts to narrow the holding in *Jones* by arguing that this Court has "rejected 'bad men' cases where the alleged 'wrong' occurred wholly outside the lands of the plaintiff's tribe." Def.'s MTD at 17 (citing *Hernandez v. United States*, 141 Fed. Cl. at 462; *Pablo v. United States*, 98 Fed. Cl. 37, 381–82 (2011); *Herrera v. United States*; 39 Fed. Cl. 419, 420–21 (1997)). However, as the plaintiff failed to argue that off-reservation activities could give rise to a "bad men" claim, and as the Federal Circuit explicitly declined to impose a geographical limitation on "bad men" provisions, the Court declines to address defendant's argument. *See generally* Pl.'s Reply; *Jones*, 846 F.3d at 1361.

In its briefs and during oral argument, plaintiff repeatedly argued that the Opioid Bad Men "manufactured, distributed, and dispensed prescription opioid drugs to and within the [']*economic proximity*['] of the Tribe," whatever that means, as well as alleging that such actions constitute on-reservation activity. Compl. at 29 (emphasis added). Ultimately, the Court rejects plaintiff's argument that such off-reservation activity, even that which is within the economic proximity of tribal lands, can constitute an on-reservation harm. Moreover, although the Court acknowledges that "the bad men provision may take cognizance of off-reservation activities that are a clear continuation of activities on-reservation," *Jones*, 846 F.3d at 1360, the Court need not

---

[7]     During oral argument, plaintiff attempted to bolster its argument that the Opioid Bad Men committed on-reservation wrongs by stating that doctors at on-reservation clinics over-prescribed opioids as a result of the Opioid Bad Men's wrongful actions. The Court declines to consider this point as it was excluded from both the Complaint and Response. *See generally* Compl.; Pl.'s Resp.

- 10 -

engage in such an inquiry in the case at bar, as plaintiff has not made such an argument and has only alleged off-reservation activities.  While not solely dispositive on the case at bar, the Court notes that plaintiff's allegations are unlikely to fall within the intended scope of the "bad men" provision, as its general purpose was to ensure "that the Indians shall be responsible for what Indians do within the white man's territory and the government shall be responsible for what white men do within Indian's territory." *Janis v. United States*, 32 Ct. Cl. 407, 410 (1897).  As plaintiff has failed to allege any on-reservation activities or off-reservation wrongs resulting directly therefrom, the Court need not determine whether such activities were criminal.  As such, plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6).

## IV.   Conclusion

For the reasons set forth above, defendant's Motion to Dismiss is hereby **GRANTED.**  Accordingly, plaintiff's claims are hereby **DISMISSED** for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.  The Clerk is directed to enter judgment in favor of defendant, consistent with this Opinion and Order.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge